This is Case 3-18-0384, Manteno Community Unit School District No. 5 v. IL Property Tax Appeal Board and DSI Manteno owner, et al. Mr. Ginsburg? Good morning. Good morning. I want to tell you, there are normally, as Carter will not be able to be here this morning. He apologizes. You will hear the oral argument. You will conference with Justice Wright and myself and be part of the decision-making and a full discussion of the matter. So with that said, Mr. Ginsburg, if you want to begin. Sure. Good morning, Your Honors, and may it please the Court. My name is Scott Ginsburg. I represent Manteno Community Unit School District No. 5 in this case. At issue here is whether the PTAB erred as a matter of law when it adopted the value of an Illinois supportive living facility that it was admittedly based upon below-market contract rents and not based a market value for the subject property. The PTAB, the Property Tax Appeal Board in this case, found that the subject property, a supportive living facility, has monthly rent that is dictated by the Illinois supportive living program and that for that reason, the subject should be based upon those rental rates, although the subject property actually earns much, much money than those rates in total revenue. The starting point for this case is the valuation of supportive living facilities under 35 ILCS 10-3-90 of the Property Tax Code. That section of the Property Tax Code simply dictates that a local assessment officer must use the income capitalization approach when valuing the supportive living facility. That is not a provision of the Property Tax Code that provides a preferential assessment that would dictate a below-market value for a supportive living facility. Under the income capitalization approach, the appraisers are supposed to take information from the market and data that reflects the considerations of a typical investor in a property and then take that information and put it together in a formula that will ultimately result in a fair cash value for the subject property. The two appraisers here took two different approaches to an income capitalization approach. The school district hired an appraiser, Mr. Maroos. Mr. Maroos took rates from the marketplace. He went out and found in the comparable localities the best data available to arrive at a value that supported the county's assessment for the subject property that was about $5 million in total fair cash value. The taxpayer, on the other hand, took rates that were admittedly below-market contract rates. They were the rates that were provided to it by the Department of Health Care and Family Services that were rates that were supplemental Social Security attributable to a Medicaid resident, although the subject property is not a Medicaid-only facility. It simply is certified to take Medicaid residents, and only 25 percent of the rooms for the facility need to be Medicaid eligible. In essence, the taxpayer characterized the subject property, and Mr. Honiger and his Can I back you up quickly and just ask you a question because that weighed on my mind as I was preparing. Is there a minimum requirement for low-income residents to be a supportive living facility to be certified as one? It's a little bit mixed. If the private pay residents pay the same as the Medicaid residents, then there is no minimum requirement. Here at Heritage Woods, you could have one person that's Medicaid eligible, and everybody else could be charged $620 per month, in theory. You could have one person that's Medicaid eligible. Everybody else has high Social Security or their private pays, but they would still, on the books, be assessed or allocated $620 of what they pay would go towards rent. That would be what the owner of the property actually allocates. Okay. Do we know what the breakdown is of Heritage Woods? The testimony was from Mr. Maroos, who was the only one who really testified. He believed it was a 55-45 split with 55 percent being Medicaid eligible and 45 percent being private pay residents. Thank you very much. You're very welcome. In this situation, we have a medical facility that's a full-service facility certified to take Medicaid patients. When you have Medicaid patients or Medicaid residents, you have to follow these dictates. The subject property itself is not low-income housing. The subject property is a facility that has a mix, and there's just this one specific section of the code. The issue at trial was whether the local assessment official must use that $620 rate or whether they were supposed to derive their rates from the marketplace. At the hearing, there was really no dispute between the taxpayer and Mr. Maroos as to issue was. We got an order asking us to clarify why this was an issue of law because there was no dispute. I don't think there's a dispute in the taxpayer's and the school district's brief as to whether this rate should be market-derived rates or contract rates. The only real issue from the trial was whether this owner was entitled to receive a preferential assessment much lower than the market value because of this set-aside for Medicaid that has to take this portion of the cost. The result of the PTEB's decision, therefore, is that every supportive living facility in the state of Illinois, and there's about 150 of them, and about a third of those are owned by the same owner here, is that under this ruling, those rates are going to dictate what the rental rate is for each of these facilities, no matter where it's located, no matter how big the rooms are, no matter whether it's a one-bedroom or a two-bedroom or a three-bedroom. It's all going to be the same thing. Whatever this SSI rate is, it's going to be a uniform assessment for all supportive living facilities, whether they be in Winnipeg, Illinois, downtown Chicago, or Manteno, Illinois. That's, again, not in dispute. That was the questioning at the hearing. We asked the appraiser, Mr. Honiger, if you take this property and put it in Winnipeg, Illinois, one of the richest suburbs in the country, it's still going to be $620 a month, and that's what the property tax value is going to be. Yes. Mr. Honiger said, yes. If you take that same one and you bring it to downtown Chicago and put it in the loop, again, $620 a month. Yes. That was how he read the statute. Now, again, if you look at the statute, it doesn't say that. It says appraisers must, or the local assessment official must apply the income capitalization approach. Now, there's a subsection, B1, that states that the income capitalization approach under Illinois, you may not consider payments for services when such services are attributable to services and not real estate. Well, and this was something that case in Moultrie County, where the PTAP found that simply clarifies that you're not supposed to include revenue for services when you're doing an income capitalization approach. That is how Mr. Maroos read it. That's how we read it, and the taxpayer would be different. I'm going to back you up just a second. The statute says that you don't include services based on an assumption that the resident would be Medicaid eligible. Based on that assumption, if the 45% of the private pays were Medicaid eligible, then their services would be capped at, I say, $2,100, roughly what the Medicaid payment would be. To me, it seems inconsistent to cap rent, but not to cap expenses or services, excuse me, services, because that allows for some hidden income here, because I understand the record that everybody gets exactly the same services. Somebody, private pay, who's living next door to low income, they get the same services, but the guy in the higher income bracket allegedly pays more for the very same services. Correct. They're entitled to charge more. Yes, I'm sorry. Go ahead. When Mr. Honiger testified in Evergreen, he factored in 40% for the higher income customers, and that was based on a higher rate that that facility, Evergreen, charged on paper for the higher income residents. Now, I'm presuming that that practice has changed at Heritage Woods, and there is no difference between the bill that private pays get and the bill that high income get, and they're all $620 now. Is that correct? Well, this question was presented to Mr. Honiger and Mr. Mitchell, the owner, at hearing, and we asked him what happens when a potential tenant asks about the price. He told them, well, we're going to quote you the entire package price, and the total package price is going to be something between $3,500 and $5,500, and it makes no difference to the resident themselves how the owner allocates the revenue. What you're going to do is you're going to pay more money if you have a bigger room, and the owner is just going to allocate that money to services, anything above $620 to services. In fact, didn't Mr. Mitchell admit that there is a real estate component in the Medicaid charge or in the $620 rent? He did. We asked him, in the situation where someone pays $325 for a one-bedroom compared with a studio, they're paying $325 more. We asked him directly, what are they paying for? He said the real estate. Mr. Mitchell is affiliated with Heritage Woods, correct? He's the representative of the owner. He's the property manager, and he's in charge of property taxes for Heritage Woods. Mr. Honiger's report is a restricted-use report, correct? That's correct. That relies on numbers that Heritage Woods provides to Mr. Honiger. Correct. Mr. Honiger testified that he never looked beyond those numbers. He never investigated if those numbers were market-supported or anything other than the numbers provided by his client to give him a property tax valuation. In past decisions, has the PTAB ever relied solely on a restricted-use report? Not that I'm aware of, we questioned him on this at the hearing because typically, a restricted-use report is the audience for a restricted-use report is the client and the appraiser for private purposes. Restricted-use reports are not supposed to be used in the property tax appeal board proceedings. Whether there's an actual rule on that, I can't quote you one, but I can tell you that in general, this is a situation where appraisers, the custom is to use a summary narrative report that provides the backup data showing where you received the information. In the first Peterson case, the one that went to the fourth district, I think Mr. Honiger did use a restricted-use report and the PTAB rejected that, if I'm not mistaken, but I'll have to study that decision again. Based on your knowledge, is there any history, any past history where the PTAB has relied solely on to assess value based on income capitalization? No. To my knowledge, that's a disqualified appraisal in general. I can only speak from my personal experience of practicing before the property tax appeal board for about 10 years and the custom is to use a summary narrative report that provides the backup data. In the appraisal industry, under the uniform standards of restricted-use reports are not to be filed with public agencies. They're by definition reports that are for the client based upon private information or information that's not meant to be public information. I see your yellow light has come up and I've taken a lot of your time. That's okay. I appreciate the questions. In general, we just want to point out that in this case, just all the different ways that this decision leads to an absurd result where 620 being a uniform assessment for all properties in the state of all these supportive living facilities in the state of Illinois, no matter how they're operated, no matter how they're occupied, is just clearly not what the statute intended. The statute intended an income capitalization approach that the Illinois legislature knows how to do a preferential assessment. They know how to uniform assessments. We have examples of that in the property tax code. We do that with wind turbines. We do that with certain types of low-income housing. We do that with farmland. This is not a situation where the property tax code in any way calls for a uniform assessment or a preferential low value based upon the information that's not supported, that's Of course, I have one question. Now, I'll just say lightheartedly that with Justice Carter not being here today, maybe I have a few more minutes for questions because he's always a very spirited interrogator at times during oral arguments. I have read a lot of the PTAB's prior decisions and they right now are becoming a little muddled in my brain, although I have a spreadsheet to help me later. There was one that involved Imboden, I believe was the name of the facility. I see some nods there, but in that case where that Imboden was a comparison that was presented to the PTAB and the PTAB found that that comparison was the most reliable way to measure rental income for the private pay people, but Imboden was an independent living facility. I'm wondering what your position is on the PTAB's decision to rely on numbers from an independent living facility for purposes of comparison in that case, but to reject Marousse's testimony because he relied on independent living facilities in this case. I feel like it's an inconsistent result and it leaves assessment officials and appraisers without direct knowledge, without clear direction as to how they are supposed to value these properties. A supportive living facility is, I think the testimony bore out that it's basically an assisted living facility that has some Medicaid certification. They're not really different setups. There was talk about different amenities, but we never really went into that. I think it's up to the appraisers and the assessment officials. I think Mitchell did go into that because he said, and he made it very clear that people who pay less don't get less services. The reverse is true. People who pay more don't get more services. I think that is addressed in the record. Right, but it doesn't say with assisted living facilities. I think the PTAB, one of the reasons they didn't like my appraiser Marousse's comparables is because he relied upon assisted living facilities and independent living facilities when the subject is a supportive living facility, but what the record doesn't really bear out is what the difference between those are. It just says there are differences, but it doesn't... The only difference is the method of payment. Medicaid sends a payment directly to the facility and for the private paid people, they hand the check to the facility. That's my understanding. Because this is a market-derived valuation, it's supposed... My reading of the statute is it's supposed to be a market-derived valuation. You would go to the market and you would get the most comparable properties in the locality or similar localities, and that's where you would derive your valuation. I feel like that's what Mr. Marousse did. That's not what Mr. Honegger did, admittedly. Then the question becomes, how are you supposed to value these properties? Do you think it's inconsistent for Mr. Honegger to rely on Section 42 properties in terms of comparisons and the PTA be relying on that, but rejecting an analysis based on comparables with independent living facilities? Because to me, Section 42 property is a great example of an inconsistency there. Yeah. We had two appraisers, especially Mr. Dost, who is the review appraiser, testified that Section 42 housing are basically garden apartments. Unlike this, which is like a hotel where you walk in and you have all your services, more like a full service thing, Section 42 is a completely different structure. You have your own apartment. You walk in from the outside. You have your own parking spot. You walk in, you walk out. It doesn't have the amenities of a supportive living facility like a beauty salon and a recreational area and a commercial kitchen and I think a dining hall. They're completely different. But is Section 42 really is independent living because there are no services provided to those Yeah. Well, you've answered my questions and probably some of Justice Carter's questions too. Okay. Well, I appreciate the time and the careful reading of the record. Thank you. All right. Ms. Quinn, are you first or Mr. Moss? I'm first. Valerie Quinn on behalf of the Property Tax Appeal Board. In light of what I just heard, I would like to point out that it was not merely Mr. Honegger who testified that $620 is market rate rent everywhere. The school district's own expert, Mr. Dost, he also admitted that that rental rate is market everywhere. So there was evidence to support... For low-income residents. That it's all based on people's social security payments. For low-income residents. It is market-based for that. And as we saw in Evergreen, there were some different rates charged to high social security level people or private pays. It just so happens that Heritage Woods doesn't distinguish in the way they charge people. It's evolved a little bit. Well, by regulation, Your Honor, and by the schedule that's published by DHFS, the $620 rental rate is the rate everywhere for all of these facilities. And that's why Section 42 is actually a fairly good comparator here, Your Honor, because Section 42 is only low-income housing. They charge about maybe $500 to $600 rent. But it's housing. It's not independent living in any way. That's what made it a good comparator because you don't have the issue of what services are involved. It simply goes as a comparison to the real estate. Now, I think we all agree that the standard of review here is manifest rate because where both parties use the same valuation approach, the issue on appeal involves a difference of opinion as to fair market value, which is a question of fact. And here, the statute mandates and the parties agree that the income capitalization methodology is the only approach for valuing supported living which are heavily regulated, restricted-use, special-use properties that are restricted in what they may charge for rent. And the parties here differed solely in the pieces of evidence that they selected and the calculations that they used to arrive at their respective appraisal opinions. And as the... Mr. Honiger's numbers measure the capacity to earn income as our of Heritage Woods. I'm a little bit troubled because Honiger has assumed single occupancy across the board. He's measuring rental income based on 87 occupants or residents and there's a capacity for 137 here. There was some testimony that that 137 number was more of a fire code number than anything else because the majority of units at Heritage Woods are those one-bedroom, 44 of those one-bedroom apartments, I believe it was. You're not going to find that like what Mr. Mitchell testified to that throughout these facilities, it's about a three to four percent double occupancy rate, which makes sense, Your Honor, because this is targeted at low-income people who need some kind of Medicaid-eligible services. The likelihood of finding a married couple that both qualifies for that to go into a one-bedroom is kind of going to be rare. It's... and you're not... In that case, what would happen if one was Medicaid-eligible, wouldn't they be charged rent at $620 plus the capped Medicaid services? And the second occupant, the second person, could be paid the highest rate possible for services if they weren't eligible. If you don't need the services, you're not going to be accepted into one of these... What if they do need? Well, there's a lot of private pay people that are assisted living that might not need the services and are just paying full rent, aren't there? But those... No, no. This special... Supportive living facilities are special use facilities. They are Medicaid-certified and they are only for people who need Medicaid-type services, be those people already on Medicaid or the other part of the population this is targeted at is those people who right now have too many assets to qualify for Medicaid but cannot afford 10 or 5 or even 2 years in a market-level independent living facility. The beauty of a facility like this is they can go in at private pay, reduce their assets, apply for Medicaid, qualify for Medicaid, and stay in their same locality with their same familiar surroundings. I understand that, but the spend down here is allocated by Heritage Woods towards services so that income is camouflaged, so to speak. It doesn't show all the rental income. It's for... Anything over the $620, Your Honor, is required to be allocated to services because... I mean, for example, and there is testimony about this... Does Medicaid pay for services above $2,100 for the second occupant? Would Medicaid pay for services above $2,100? Medicaid will not pay more than the 60% of whatever the weighted average... I mean, we know that Medicaid payment... So, why are the private pay people or the high-level Social Security people paying more than $2,100 for services? Because that helps... We know... One thing we know about Medicaid payments is they are low. They generally do not reflect the true cost of services and there is some testimony in the record about the true cost of services. It's very minimal. Being able to take some private pay patients and allocate that income to services helps offset the fact that Medicaid payments are quite... They tend to be low. They don't reflect the true cost. And I think that with this statutory framework, Your Honor, the General Assembly has decided that these facilities provide a valuable service and it would be problematic to tax them out of existence, which could happen, and especially when you're using... Well, that's why you have comparables to make sure that a facility like Heritage Goods isn't undervaluing the rental component of what private pay people are handing over the counter to the administration. So, that's where the comps come into play. And the comparables of Mr. Maroof show how imbalanced the rate charged to the private pay and high Social Security income was. But by regulation, Your Honor, anything the facility receives over $620 for the room and board is required to be allocated to services. And for the Medicaid patients, it functions as an offset. So, if someone has, I think the example is you, $750 of Social Security income, $620 goes to rent. I understand. $90 for the personal allowance. Right. But then the $40 offsets Medicaid's portion of the payment. So, it actually doesn't go to the facility as something over. It has to go to offset the payment that Medicaid makes. And that's in the regulations. And does that go to Medicaid then? It goes to offset Medicaid's payment. It reduces the Department of Healthcare and Family Services payment that they make. So, it doesn't go to the facility as some kind of extra gravy. It goes to offset the Medicaid payment they would otherwise have gotten from the Department of Healthcare and Family Services. So, Medicaid's position is there's no extra gravy in Mr. Heinegger's? Not that the Property Tax Appeal Board could see. And there's a couple more points I'd like to make because I would like to address that Peterson case and the issue of summary and restricted use. I've had appeals in the past where a restricted use appraisal was used. It simply goes to the briefing on how many cases the Property Tax Appeal Board has accepted as evidence a restricted use report. I would be very happy to supply that. In this case, the restricted use report is the only thing that the PTAB relied on. But as the hearing officer said, it doesn't change. It goes to the weight. It doesn't change the outcome. Now, if I have a moment. If you wanted to talk about the Peterson case and which the after? All three of these cases, Evergreen, Peterson, and Mantino, they were all kind of coming up around the same time. The one that went to the fourth district. Yes. Now, as prior effect in these sorts of proceedings, the Property Tax Appeal Board is limited to considering the evidence that is placed before it in each case. Its decisions are not precedential and it didn't depart from anything in issuing the final administrative decision in this case. It based its decision on the very extensive and explicit testimony about the nature and the mandates and the requirements of the supportive living program. The prior administrative decisions do not dictate the outcome in this case. And in fact, in Peterson, there was absolutely no mention of the DHFS rental rate at all. But Peterson is interesting, Your Honor, for two reasons. First, both the taxpayer and the Board of Review chose to present market rate independent, non-supportive living facilities as comparators there. Now, that was the taxpayer's choice, Your Honor. It's not the board's role to say, you know, if you want a reduction, maybe that's not the best evidence you could be providing. Isn't that exactly what they said in Evergreen? If you want a reduction, Mr. Honegger, don't give us a restricted use report. And it was again, Evergreen was based, there was, again, there was no, there wasn't a clear testimony about the restrictions on supportive living facilities as there was in this case. In Peters, Peterson is interesting for two reasons. One is that choice, that evidentiary choice on behalf of the taxpayer. And the other was the appraiser's use of including service expenses, but excluding service income. Yes, I understand that. That's why it went up on appeal. And the board said, that's absurd because that skews the resulting valuation too low. Well, here, Mr. Maroos made the same mistake, the reverse image of that, the mirror image. He included service income and he admitted as much, but he excluded service expenses. And that is equally absurd because it skews the 620 and not cap the services income at 2100. And I know I'm off a few dollars on the 2100. But isn't that the same inconsistency that the PTAB rejected in Peterson? Capping service, I don't believe so. I would have to go and look again at the Peterson decision because I mean, sorry, not Peterson. Did you, did you want to say Evergreen? No, it was Peterson. Peterson, the methodology was rejected because the service expenses were deducted, although the service income was not included. So right, which is, which is consistent approach in both rent and Medicaid being both capped based on the public rate. I see that there's a skewing for Heritage Woods that under reports their rental income. But I'll, I'll let council for Heritage Woods speak for that. Thank you very much for answering all the questions I've peppered you with. Thank you. Thank you, Mr. Krantz. And Mr. Moss, you have seven and a half minutes, more or less. I can't hear you, Mr. Moss. I may please the court and council. I'm Tom Moss, attorney for the taxpayer. Yes, I Mantino owner LLC, which we all refer to as Heritage Woods, I think in this matter. And let me start by saying I would agree with the position and the Mr. Moss, are you speaking? Can you hear me? It seems to have gone blank. Just one of those technical difficulties. I'm sure that our clerk's office is working on it. I don't know. You're hearing me, Mr. Moss. Your image is gone. I don't know what just frozen. And we can't hear you. I don't know if you can hear me. All right, justices, we pause the timer. We're going to get him back on and we'll just reset it. Right. I think we're ready. Is Mr. Moss on the line? Yes, Judge, I am on. All right. Well, we're sorry about that. But please continue your argument now. It's timed as of the time you started the last time. And I hope your blood pressure is not too high, Mr. Moss. Just relax. We all had a very nice comfort break. Okay. Well, I'm sorry about that. I think we lost our Internet here at the office. I don't know. No worries. You're good now. Okay. Well, as I said, I'm Tom Moss, attorney for the taxpayer, DSI, Mantino owner LLC, who we all refer to as Heritage Woods, I think. And where I'd kind of like to start is how we got to this contract rent issue in the first place. And that's because the Department of Health Care and Family Services, which was public aid, was directed by the Illinois legislature to establish and provide oversight for a program of supportive living facilities that seek to promote resident independence, dignity, respect, and well-being in the most cost-effective manner. And that led to the department in starting the supportive living program. And that direction can be found in 305 ILCS 5-5.01a. And then from that point, they came up with the supportive living program. And the supportive living program is controlled by the Illinois Administrative Code. And in order to participate in that program, a supportive living facility must be certified by DHFS, Department of Health Care and Family Services. And to become certified, you must comply with section 146.215c of the Illinois Administrative Code. And I believe all the parties agree that Heritage Woods is an 87-unit certified SLF with a maximum occupancy, which has come up earlier today, of 137. And once you're a certified SLA, then you're to be valued by the special section 10 tax code, which is 35 ICLS 200-10-390. And that's what provides that you use the income approach. And... Mr. Moss, can you tell me what the percentage is required for low-income residents? Or is there one? Here's... Let me just say this. I think if Mitchell's testimony was that there's very few that aren't. But the code, the administrative code, provides that if you charge the Medicare and the private pay the same for room and board, then there has to be at least 25% reserved for Medicaid people. And if you don't do that, or if you do do that, it's first come, first serve if you don't. So... All right. That helps by anybody is the things in the administrative code, which pretty much controls this. It also sets what the rent room and board rate's going to be, which I think has been touched upon. But that comes from the administrative code. And that's the SSI of minus $90, which came out. But that's not just a number pulling out of the air. And as I think was mentioned earlier by someone, if somebody's in and their SSI is more than the minimum, then that money does not go to the facility. It goes to public aid. What about the private pay people? What about the private pay people where the money is not going to Medicaid for a reimbursement? Where does that money go? Well, the private pay people are charged room and board the same as in this facility. And this was testimony from David Mitchell. They're charged the exact same room and board as the Medicaid people. And any excess goes to pay for services. And it goes to Heritage Woods, correct? Yeah, I think it does. And the services are exactly the same? No. I think private care people sometimes have more services. But that's just, I think, a case-by-case basis. And I'm not absolutely sure of that. Boy, in this record, Mr. Mitchell made it pretty clear that everybody got the same services. But I'll study the record again and make sure that I haven't misstated that. This facility costs $8 million to construct. That's a pretty pricey investment. Why is it that Heritage Woods isn't 100% full of these low-income residents, if that's the purpose of having a supportive living facility? I can't answer that. I think I can tell you, I don't know what the demand is. But some of the private care people come in, it's my understanding, and I think maybe Mr. Mitchell testified to this, and maybe someone mentioned it earlier today, that some of the private care people come in because they know that their funds are going to be gone. And within a short period of time, or a reasonably short period of time, they're going to need to be in the facility where they get the Medicaid services. Well, then eventually there would be 100% low-income residents. But that doesn't seem to be the case. Well, you've got to realize there's quite a bit of turnover in these things. I understand. I understand. It's not like an apartment where they move in, and they're going to stay 20 years. I don't think that wouldn't be the norm. I understand. I understand. And in these times, I'm sure that with COVID, the turnover is terrible. Right. I'm sure that's the case, unfortunately. But there's only a 2% vacancy rate, and I'm open rooms go to private pay. What's that policy? I'm not sure I understand the question. The vacancy rate is, and this comes somewhat in with Section 42 properties, which came up, is Mr. Honiger and his calculation to come up with the and regular expenses are so economical, you can't really figure it out. He looks at Section 42 properties, which don't have services, but have meals and that sort of thing, and looks at the expenses of those and compares them. And that's where the 42 properties come in. And as far as the vacancy rate goes, I think that's just basically somewhat historical. If my father needed to be housed at Heritage Woods, and unfortunately, my father is no longer on this earth, but if he needed to be, and I picked up the phone, and I called Heritage Woods, and I said, you know, he's not Medicaid eligible. What is the rate? I want to compare your rate to the facility in Winnetka. What's your rate? What would I be told? They would give him a rate, and, you know, I can't tell you what the number would be, but it would include the room and board and the services. Right. And his monthly payment, all that would be applied to room and board at this facility, according to Mr. Mitchell's testimony, would be the 620, I think it was in this case. So I would get just a ballpark number, a package number, and nobody would tell me over the telephone that your private pay father would be paying only $620 in rent. I'm not positive of that, but I think that could be the case, because I know that only the 620, if that's the number, would be applied to room and board. This PTAB decision was a great benefit to those that are building $8 million facilities. In Peterson, there was a reduction, but it was only half a million dollars, $400,000. And in Evergreen, there was no reduction whatsoever, and that included Mr. Honiger's testimony and some comparative analysis for private pay people. Here, there's a $3 million reduction in assessed value. Has the PTAB, to your knowledge, ever granted such a reduction in a supportive living setting? Did you, Prairie Windsor-Urbana, there was one where they considered the, which is in the record. Right, and that's based on what happened here. They just followed the same protocol. Yeah, that was based on what happened here. What was the reduction in that case? And if you don't know, that's fine. Yeah, no, I don't know off the top of my head. I'd have to. That was a case I was involved in, and so was Honiger. So this decision has... But it was done, and the appraiser in the Prairie Winds thing was Webster, who came up with a really high number, and the PTAB, or the Board of Review, they accepted the PTAB decision, and they also, at the hearing, said they didn't want any higher assessed value than what they had assigned to it, that they weren't going to even ask for what Webster was asking for. Okay, I'm trying to figure out in my brain why there's such a difference between these cases, Peterson, Evergreen, and Mantino, which were decided within a relatively short time span of several years. I looked to see, sometimes our court is inconsistent in decision making because the makeup of the panels will kind of shift the way a case will go on occasion, but the decisions and the makeup of the PTAB members that signed off on all three of these cases, did you explain why Mr. Honiger was not required to factor in rental income for private pay people differently, in your case, as in comparison to Evergreen and Peterson? Well, let me say first, in Evergreen, the way I'm reading that is that the question with the hearing officer and that, or the PTAB, was that they were looking at the chart that's put out annually for the monthly breakdown by the department, and they came in on the word, the chart estimates the monthly revenue, and what the problem was, I saw in that case, was that the word estimates used, because they didn't have any testimony like we had with Mr. Mitchell, that explains if there's money over and above the room and board, because the person has higher SSI than the minimum, that that goes to pay Medicaid and not to rent, and I think that was an issue in Evergreen place. But with Mr. Honiger not considering private pay rates of services at all, isn't he factoring out the income that private pay people are paying above what Medicaid would have been reimbursed? Have they been Medicaid eligible? I think that's going to services. Well, I agree that Heritage Woods labels it as services, but our task here, in looking at the methodology, is to decide whether they are truly services or whether it's a rent component that Mr. Mitchell conceded is present in the Medicaid rate. So, you know, we'll sort all this out, but I just wanted to get your input on the difference between Evergreen and this case seems to me to be a matter of bookkeeping, that in Evergreen there were on the books, I think it was $1,040 per month for a studio, and my numbers might be off, where the Medicaid people were only charged $620. And so Honiger factored in that difference on the private pay people in terms of income earning capacity. Here, and correct me if I'm wrong, I think the bookkeeping is just different for Heritage Woods, because now everybody shows on the books for purposes of this restricted use appraisal that rent is $620. Am I being unfair to Heritage Woods in viewing this as a bookkeeping difference between Evergreen and Manteno? I think part of what maybe the statute for evaluation of supporting living facilities, you know, in section B-2, says that payments by a resident for services that would be paid by Medicaid if the resident were Medicaid eligible, and that such payments constitute income that is attributable to services and not attributable to real estate. Right, and so what do Medicaid eligible people receive for services? What do they receive? Yes. Isn't it about $2,000? The Medicaid in Kankakee County for the year we're talking about would have been $21.71. Yeah. So that $21.71 comes off of income into the facility because of the statute. Well, why isn't $21.71 the amount that comes off of income for private pay people with respect to services? Well, I think if they get extra services and it's Medicaid and the resident pays it, and if the resident were, let me think this through a minute. If the services they receive would have been paid by Medicare, they're not talking about the amount, just if they would have been paid. Well, aren't we required to talk about the amount? Because there's no way Medicaid is going to pay for services in the amount of $4,000. No, and that's why... And that's what private pay people might be paying. They're paying for the services, and then it says that those payments constitute income that's attributable to services. They're not talking about the amount of services, they're talking about the service that was given. So when I call up and say, my dad is going to be private pay and he needs to come live with you, you would say that's roughly about, you're going to be paying about $3,200 out of your pocket until his income or his assets are paid down, which would mean... I have to do my math quickly here. There's $2,680 that my dad would be paying for services. If those services are exactly what Medicaid pays for at $2,100, why isn't there $700 additional income that Heritage Woods is keeping for private pay residents? Because the statute says that's attributable to services and not private pay. Not to the real estate. Okay. Because you call them services, then you take them out of the equation. And I understand your argument, Mr. Moss. I appreciate you answering my questions. Yeah. I mean, you've got to remember, I think this thing is ruled by the statutes in the Supportive Living Program and the charts and the certifications and the requirements in the Illinois Administrative Code. Well, would you agree with me that if there were only 25% of low-income residents at Heritage Woods today, that the amount of money coming in to Heritage Woods based on 75% private pay would be significant, correct? Well, yeah. If I knew that was the case, sure. So isn't it somewhat backwards rather than encouraging these low-income people to have a place to live? Doesn't Heritage Woods' bookkeeping actually end up in the reverse situation where your client benefits more by having private pay people and keeping the low-income numbers down? Well, that could be. But you've got to remember the reason this thing was set up was... Yeah. I understand. So let me give you the answer. The answer is the change should come from the legislature. And I understand your argument. Yeah. This is a program that was set up. And if you're not going to follow the chart, you're not going to follow the statutes, you know. Why do we even have the program? And why do we have the chart? And so why do we have the certification? Justice Wright, any more questions? No, Justice Blanton. Thank you for indulging me. All right. Thank you, Moss. I appreciate it. Once again, sorry for the delay. Mr. Ginsburg, any rebuttal? Yes. Thank you, Your Honor. You know, I'd like to... My understanding is that the PTAB is arguing that there's amounts of money that are received by this facility that go back to Medicaid or back to the Department of Health Care and Family Services that in excess of some certain amount. That's a new fact in the record to my knowledge. And I'm pretty knowledgeable of the code and the record and the statute. I've never heard of a payback. I'm not trying to mislead the court. It's just my understanding of how this works. My understanding is that they take any money in excess of $620 and for bookkeeping purposes, they call it services. And even if it's attributable to real estate, they call it services. Okay. Regardless, I see Ms. Quinn jumping up and down, NSS, virtually jumping up and down. Let's assume she's right. The issue here is not the Medicaid eligible people. The issue is what's happening on the private pay side. Right. So, you know, she doesn't have to supplement the record. I believe her. She knows her stuff too, so... And I just... I can't respond to that because I've never heard that before. But to the other point of whether... The benefit to Heritage Woods of having a more attractive to... They're making a facility that's more attractive to private pay by having 137-person capacity facility configured for 87 residents or 87 apartments, meaning they get larger rooms, more space. They can market it to private pay residents in a manner that's comparable to a non-Medicaid facility. And they have less Medicaid eligible people. And this is not a fire code regulation. This is from the same code that they've been quoting to us the entire... Upon which the case rests. This is the structural requirements for a supportive living facility under 86 Ill Administrative Code 146.210 D1 and 2, which states how large the rooms must be for one single and double occupancy facilities. It's the same code that provides the service requirements and the structural requirements. So, you know, it's true. They are trying to have a facility that's attractive to private pay, but try to get the benefits of a low-income housing, which I don't think this is low-income housing. And, you know, we talked a lot about the requirements of taking the 620 and anything in excess of that going to the services, but that is strictly for Medicaid. Every time that is stated in the code, it says for Medicaid residents only. There is no regulation on what they charge for the private pay. And this goes back to the statute, which states that the valuation is based on the income capitalization approach, period. There's no special method of determining the income capitalization approach based upon Mr. Honegger's reading of the code. And it says that payments from Medicaid or services, when such payments constitute income that's attributable to services and not attributable to real estate. Well, here we have income that's attributable to real estate and they're allocating it to services. And so, you know, I don't know if the code accidentally or purposely deals with that, but they do deal with that because here, this is not income that's attributable to services and not to real estate. It's the opposite of that. Hasn't our Supreme Court provided guidance for us by saying income capitalization measures capacity, capacity for income. And that's what we're going to tax because this is investment property. But here, what we're being asked to accept is Mr. Honegger's estimation of what this facility earns based on their creative bookkeeping. And that doesn't truly measure capacity for earning income. Doesn't that require us to assume that there is great administration that are, you know, trying to make as much income as possible for the investors? Correct. It's how a knowledgeable and typical investor would operate this property. And they would look at what a comparable facility would do and arrive at a value based upon. And that's why we call it the potential gross income. That's what we're talking about here is what is the potential gross income? And the potential gross income under Mr. Honegger's approach would be 137 units times 620. So it would be 137 times the 620 under that approach. But under a market approach, which we think that's 10-390 supports, it's going to be the potential gross income for a facility that uses market approach to arriving at rental incomes. And that's what I think you may have misspoken because Mr. Honegger's assumption was based on 87, not 137. Right. But if we're talking about the actual potential gross income, the potential for this facility based upon the code is 137. If he wants to do the overly literal or literal approach that he's taken here, then he should have done 137 and not 87 because 87 is the business decision of this owner that has nothing to do with the property taxes. And they're using that configuration to get a lower property tax value, but they're using it at the same time to attract- I see your light is up. I don't want to be unfair to the other litigants. I don't have any more questions to pepper you with. Thank you. Well, we appreciate your time. And thank you very much. Have a good 4th of July weekend. All right. And thank you all for your arguments today. It really does matter. Under advisement, I'm getting back to you with a written disposition within a short time. Thank you again for your argument.